USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 04 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :     12 Civ. 6771 (KBF)
In re MAXSUN PRODUCE CORPORATION                            :
PACA LITIGATION                                             :     MEMORANDUM
                                                            :     DECISION & ORDER
                                                            :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

A large group of agricultural goods suppliers here sues, <u>inter alia</u>, Maxsun Produce Corporation ("Maxsun Produce") for hundreds of thousands of dollars of unpaid deliveries of agricultural products. Plaintiffs have sued alleging claims for breach of contract and violations of the statutory trust created by the Perishable Agricultural Commodities Act of 1930, as amended ("PACA"), 7 U.S.C. § 499e(c)(5). Plaintiffs have also sought preliminary injunctive relief.

Although the cases are now consolidated, plaintiffs originally brought several lawsuits; injunctive relief was sought and litigated by different counsel on different evidentiary records. In this context, the Court ordered injunctive relief in all actions, but as to different defendants.

Now before the Court is a consolidated case with a consolidated motion for injunctive relief. Defendants Thomas Qi, Maxsun Produce, and Maxsun International Inc. ("Maxsun Int'l," and with Qi and Maxsun Produce, the "Qi Entities") have failed to appear, and preliminary injunctions were previously granted as to them. In opposition to this motion, and to two of the three previously sought, the only defendants who have appeared--defined below as the "Lin

1

Entities"--have argued that they have no current connection with Maxsun Produce. Plaintiffs respond that the corporate lines between Maxsun Produce and the Lin Entities are blurred, and that their corporate separateness is a sham. Plaintiffs, however, fail to proffer any evidence at all indicating that the Lin Entities control or are actually involved in the day-to-day operations or business of Maxsun Produce. As more fully explained below, because the statutory trust created by PACA extends only to those individuals and entities who do have such control or involvement, plaintiffs' motion for preliminary injunctive relief as to the Lin Entities is DENIED. Moreover, and for convenience, the orders imposing preliminary injunctive relief previously issued in these consolidated actions are hereby VACATED and the preliminary injunctive relief as issued in this Memorandum Decision & Order's conclusion is hereby ORDERED.

## BACKGROUND

The following facts are drawn from the parties' pleadings and motion papers in this matter, as well as from the letter briefs the Court previously ordered on January 11, 2013 (ECF No. 87).

### This Lawsuit

The various plaintiffs in these consolidated cases are sellers of fresh produce and other agricultural products. (See ECF No. 99 ("Armata SAC") ¶¶ 3.a-d; ECF No. 101 ("Sunterra FAC") ¶¶ 23-24.) Between early 2012 and approximately mid- or late-August 2012, plaintiffs sold hundreds of thousands of dollars worth of

produce to defendant Maxsun Produce. (See Armata SAC ¶¶ 6-7; Sunterra FAC ¶ 23.) Maxsun Produce failed to make full payment for those shipments. (See Armata SAC ¶ 7, 10; Sunterra FAC ¶ 26.)

In September and October 2012, various plaintiffs sued, seeking unpaid balances. Those complaints have been amended, and now assert claims against the same group of defendants. In addition to seeking payment under contract theories, plaintiffs have sued under PACA. Plaintiffs allege that--pursuant to PACA's terms--defendants are statutory trustees of a trust (the "PACA Trust") created for plaintiffs' benefit equaling the amount owed to plaintiffs, upon defendants' receipt of the agricultural produce. (See Armata SAC ¶ 8; Sunterra FAC ¶¶ 32-33.) Plaintiffs further allege that the res of the PACA Trust consists not only of the produce received from plaintiffs, but also of:

> [a]ll of defendant [Maxsun Produce's] inventories of perishable agricultural commodities, all inventories of food or products derived from said commodities, all accounts receivables [sic] and other proceeds from the sale of such commodities, and assets commingled or purchased or otherwise acquired with proceeds of such produce or products . . . including [such assets] transferred and/or diverted from [Maxsun Produce] to the other [named defendants].

(Sunterra FAC ¶ 32.)[1] According to plaintiffs, Maxsun Produce not only failed to pay for the produce it received from plaintiffs, but has also unlawfully transferred

---

[1] See also Armata SAC ¶ 8 (plaintiffs "became beneficiaries in a statutory trust designed to assure payment to produce suppliers. The trust consists of all produce or produce-related assets, including all funds commingled with funds from other sources and all assets procured by such funds, in the possession or control of Defendants since the creation of the trust.").

3

assets of the trust and funds received from sales of those assets. (See Armata SAC ¶¶ 25-28, 39-43; Sunterra FAC ¶ 40.)

In conjunction with bringing their various lawsuits, plaintiffs all sought preliminary injunctions. On September 25, 2012, the Court issued a preliminary injunction in E. Armata, Inc. v. Maxsun Produce Corp., 12 Civ. 6771, against Maxsun Produce, Qi, and Johnny S. Lin. (ECF No. 18) That order covered companies allegedly controlled by Maxsun Produce, including Maxsun Corporation ("Maxsun Corp."), Maxsun Packaging Corp. ("Maxsun Packaging"), Maxsun Furnishings of NYC, Inc. ("Maxsun Furnishings"), Master Packaging Corp. ("Master Packaging"), Micarole Enterprises Corp, ("Micarole," and with Maxsun Corp., Maxsun Packaging, Maxsun Furnishings, Master Packaging, and Lin, the "Lin Entities"), and Maxsun Int'l. (Id.)[2]

On November 30, 2012, the Court issued another preliminary injunction, this time in Fierman Produce Exchange Inc., et al. v. Maxsun Produce Corp., et al., 12 Civ. 7084, against the Qi Entities and the corporate Lin Entities, but not against Lin. (12 Civ. 7084, ECF No. 14.) In opposition to the second preliminary injunction motion brought against him and his associated companies, Lin put forward evidence supporting his position that he has no remaining connection with Maxsun Produce and should not be covered by any injunction. Thereafter, plaintiffs in Sunterra Produce Traders, Inc., et al. v. Maxsun Produce Corp., et al., 12 Civ. 7915, sought a similar preliminary injunction; and Lin took a similar position. The Court again

---

[2] The Qi Entities, the Lin Entities, and defendants Brian Cho and Yi Chen--who, like the Qi Entities, have not appeared--are named as defendants in the operative complaints in this action.

4

issued preliminary injunctive as to the Qi Entities, but did not issue it as to the Lin Entities. (ECF No. 89.) At this point in the proceedings, counsel for Lin was clear in his position that Lin was no longer associated with Maxsun Produce and its related entities. The Court therefore ordered additional briefing and an evidentiary hearing as to whether preliminary injunctive relief should cover the Lin Entities (both as to the relief already in place and the relief denied).

**The Present Motion**

On February 20, 2013, the parties jointly requested that the Court rule on their most recent written submissions and adjourn the evidentiary hearing; and the Court accommodated that joint request. (ECF No. 149.) Accordingly, and in the absence of a hearing, the Court is without any ability to assess credibility. The Court now makes the following findings concerning the Lin Entities:

Maxsun Produce was originally owned by Lin, Qi, and defendant Brian Cho. (Decl. of Johnny Lin a/k/a Hesong Lin, dated Oct. 31, 2012 ("Lin Decl.") ¶¶ 2-3.)[3] Lin also incorporated and was president of Maxsun Int'l. (Id. ¶ 12.) In September 2010, Lin transferred the entirety of his forty-percent ownership interest in Maxsun Produce to Maxsun Int'l for $400,000, and simultaneously resigned from his position as president of Maxsun Produce. (Id. ¶¶ 4, 10, 19, and Exs. A, E.) Defendant Yi Chen "signed the agreement on behalf of" Maxsun Int'l, and also, "on behalf of Maxsun [Int'l] paid consideration in the amount of $160,000." (Id. ¶¶ 5, 9.)

---

[3] This declaration was originally filed in opposition to the preliminary injunction in the Fierman action. It, and the documents attached thereto as well as the documents submitted by plaintiffs, are the sole materials relied upon by Lin in opposing the present application to extend the preliminary injunctions to the Lin Entities. (See Letter of Kenji Fukuda to the Court, dated Feb. 15, 2013 ("Lin Letter") at 1.)

5

Chen paid the purchase price personally because Maxsun Int'l was a shell company with neither cash nor assets. (Letter of Jonathan S. Bodner to the Court, dated Feb. 11, 2013 ("Bodner Letter") at 7 and Ex. E (Cheng Dep. Dated Feb. 5, 2013 ("Cheng Dep.")); see also Cheng Dep. at 60-61, 98-99, 127-28, 134-37.) Moreover, the $160,000 payment was made to Lin's company Micarole. (Cheng Dep. at 100, 111, 138-39.) But according to the sale document, the purchase price was $400,000.00, to be paid from Maxsun Int'l to Lin. (Lin Decl. Ex. A ¶ 1.2.) Only $160,000 was paid, and an outstanding balance of $240,000 remains. (Lin Decl. ¶¶ 10-11.)[4]

In conjunction with the sale, on May 5, 2011, Maxsun Produce sent a letter to an entity called EastWest Bank indicating that Chen had taken ownership of Lin's shares in Maxsun Produce, and requesting that Lin be removed as an authorized signatory. (Id. ¶ 18, and Ex. D.) In addition, Chen "became the owner and the president of" Maxsun Int'l. (Id. ¶ 13.)[5]

Aside from any connections he had or has with Maxsun Produce or Maxsun Int'l, it is undisputed that Lin has been and remains the owner of Maxun Corp., Maxsun Packaging, Maxsun Furnishings, Master Packaging, and Micarole. (Id. ¶ 28.) He also remains as guarantor on Maxsun Produce's lease and on the purchase agreements for certain Maxsun Produce assets. (Bodner Letter at 5 n.2.) Moreover, Micarole sublet warehouse space from Maxsun Produce for over a year prior to, and

---

[4] Lin claims that he has refrained from seeking that balance judicially because he "believes that [Chen] does not have money." (Lin Decl. ¶ 11.)

[5] It is not clear whether Chen became the president and owner of Maxsun Int'l as part of the initial sale or whether those transactions occurred later.

6

continuing until, Lin's departure from Maxsun Produce in September 2010. (Id.; see also Lin Decl. ¶¶ 37-38, and Ex. H.) In addition, at least in September 2010 when Lin allegedly left Maxsun Int'l, Micarole and Maxsun Int'l also shared a billing address in Brooklyn, New York. (Bodner Letter at 10, and Ex. F.) Furthermore, loans and other monies continue to pass between the Qi Entities and the Lin Entities. (Id. at 12.)

Finally, certain paperwork-related formalities belie the existence of a firm break between the Lin Entities and the Qi Entities. At least continuing into 2011, an online service called Blue Book Services[6] listed Lin as a shareholder of Maxsun Produce; and the United States Department of Agriculture's website listed him as a principal of the company. (Id. Exs. G, H (Maxsun Produce is no longer included in the Blue Book Services directory).) More recently, Lin has been physically present at Maxsun Produce's offices: On September 7, 2012, he signed a Federal Express Receipt for delivery of the original complaint the plaintiffs in Sunterra Produce Traders, Inc., et al. v. Maxsun Produce Corp., et al., 12 Civ. 7915, served on Maxsun Produce. (Id. Ex. D.)

Lin claims that after his sale of his interest in Maxsun Produce he "has no longer been the officer of [Maxsun Produce], and has not controlled and has not been in a position of control over the PACA trust assets belonging to the Plaintiffs." (Lin Decl. ¶ 15.) The Court notes too that there is no evidence in the record that:

---

[6] Blue Book Services bills itself as "the leading provider of in-depth business and credit information on businesses operating in the global produce industry." See Blue Book Online Services, http://www.producebluebook.com (last visited Feb. 26, 2013). It has been relied upon by courts as "the number one resource of produce companies." Weis-Buy Farms, Inc. v. Quality Sales LLC, 11 CV 2011, 2012 WL 280617, at *2 (D. Conn. Jan. 31, 2012).

Lin himself placed orders for Maxsun Produce, engaged in sales or purchases of produce for Maxsun Produce, accepted or authorized the expenditure of funds resulting from such sales or purchases, managed any inventories of produce, or otherwise actually managed the operations of Maxsun Produce.

## DISCUSSION

### Preliminary Injunction Standard

To obtain preliminary injunctive relief, plaintiffs must demonstrate (1) that they will suffer irreparable harm in the absence of the requested relief; (2) that the balance of the equities tips in plaintiffs' favor; (3) that the injunction is in the public interest; and (4) either (a) a likelihood of success on the merits, or (b) both (i) sufficiently serious questions going to the merits such that there are fair grounds for litigation and (ii) that the balance of equities tips decidedly in plaintiffs' favor. See Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008); Salinger v. Colting, 607 F.3d 68, 75 (2d Cir. 2010); Faiveley v. Wabtec, 559 F.3d 110, 116 (2d Cir. 2009); Hedges v. Obama, 12 Civ. 331, 2012 WL 1721124, at *19 (S.D.N.Y. May 16, 2012).

The Court has previously determined that plaintiffs have met the standard for issuance for preliminary injunctive relief as to the Qi Entities. (See ECF Nos. 18, 89; Fierman Produce Exchange, Inc., et al. v. Maxsun Produce Corp., et al., 12 Civ. 7084, ECF No. 14.) The Court need not, therefore, re-analyze those issues on the present application. Moreover, the Court adopts in full the factual findings made in those orders (12 Civ. 6771, ECF Nos. 18, 89; 12 Civ. 7084, ECF No. 14),

<u>and, as written in this Memorandum Decision & Order's conclusion, re-orders preliminary injunctive relief over the Qi Entities.</u> The only issue before the Court here is whether under PACA that injunction should extend to the Lin Entities.

## PACA

"Congress enacted PACA in 1930 to to regulate the sale of perishable agricultural commodities and amended the statute in 1984 to further strengthen the protections provided to produce suppliers." A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp., 542 F.3d 54, 57 (2d Cir. 2008). The statute provides, in relevant part, that:

> [p]erishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). Accordingly, the <u>res</u> of the trust established by PACA includes the produce purchaser's "inventories of commodities, the products derived therefrom, and the proceeds of sale of such commodities and products." Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1067 (2d Cir. 1995) (citing H.R. Rep. No. 543, at 4 (1983), <u>reprinted in</u> 1984 U.S.C.C.A.N. 405, 406)). PACA thus "imposes a 'non-segregated floating trust' on the commodities and their derivatives, and permits the commingling of trust assets without defeating the

9

trust. This highly unusual trust beneficiary status permits sellers, in the event of default, to trump the buyers' other creditors, including secured ones." A & J Produce, 542 F.3d at 57-58 (internal quotation marks and citations omitted). "Although not expressly stated in PACA, courts have unanimously held that the trust created by PACA is governed by general trust principles." Endico Potatoes, 67 F.3d at 1067.

Lin and his entities may be liable for violations of the PACA Trust at issue in this case if "they were in a position <u>to control the assets</u> of [the] PACA trust and fail[ed] to preserve those assets." <u>See</u> <u>Weis-Buy Farms, Inc. v. Quality Sales LLC</u>, 11 CV 2011, 2012 WL 280617, at *10 (D. Conn. Jan. 31, 2012) (emphasis added). Although plaintiffs cast the issue as one implicating the doctrines of corporate alter-ego and piercing the corporate veil, the "legal framework is distinguishable" from that doctrine, and instead requires that the entities in question have "had the authority <u>to direct the control</u> of the PACA trust assets." <u>Id.</u> (emphasis added). Thus, the question "turns not on whether the individual nominally held an officer position nor even the size of his or her shareholding," and "each case depends on facts found by the trier." <u>Id.</u> (citing <u>Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.</u>, 623 F.3d 163, 169 (3d Cir. 2010)).

Here, plaintiffs have certainly raised questions regarding Lin's actual, current role vis-à-vis Maxsun Produce; but they have not put forward evidence that Lin or the other Lin Entities do or could control the assets of the PACA Trust. That is what the case law requires, and that is plaintiffs' burden on this motion. To be

sure, plaintiffs have provided extensive evidence that corporate and/or transactional formalities were ignored.[7] But to obtain injunctive relief requires something both different and more: evidence that Lin or the Lin Entities actually perform acts indicative of control over the res of the PACA Trust. See, e.g., Bear Mountain, 623 F.3d at 169-74 (no sufficient control for company's vice president and fifty-percent shareholder, who signed company checks, but did not actually manage the products in the PACA trust or participate in day-to-day company management); Weis-Buy Farms, 2012 WL 280617, at *11-14 (no sufficient control when individual would place purchase orders for the company, but those orders were directed from above individual, and when individual did not control payments made from company's account, decide with whom company should transact business, or sign checks for the company[8]); Ideal Sales, Inc. v. McGriff, 95-CV-991, 1997 WL 560779, at *2-3 (N.D. Tex. Sept. 2, 1997) (no sufficient control for "second-in-command" twenty-percent shareholder with input in corporation's business dealings and who maintained records and placed purchase and sale orders--and who loaned money to the company--but who did not order payment in accounts payable, did not make financial decisions, and did not sign company checks); but see Gulf Coast Produce, Inc. v. Am. Growers, Inc., 07-80633-CV, 2010 WL 1410558, at *7 (S.D. Fla. Mar. 31, 2010) (President and CEO had "exclusive control" to manage the inventories and

---

[7] For example, (1) Lin sold a company he created to another company he created for a not-fully-collected sum paid from a third party to a third company Lin created; and (2) Lin's name remains affiliated with Maxsun Produce on certain official records.

[8] Of course, the evidence here indicates that Lin was not authorized to sign checks for Maxsun Produce.

11

accounts of company and maintain the company's books and records); Produce Alliance L.L.C. v. Green Apple Produce, Inc., Civ. 04-278, 2005 WL 1153616, at *6-7 (D. Idaho May 16, 2005) (President and Chairman of the Board attended company's business meetings, guaranteed companies assets leases, was signatory on bank accounts, and was contact for official documents).[9]

The cases cited, and the others reviewed, indicate that the sum of the evidence plaintiffs present here regarding Lin is insufficient for that required for preliminary injunctive relief as to Lin and his companies.[10]  There is--quite simply--nothing in the record indicating that Lin had any form of day-to-day control or authority at Maxsun Produce such that he controlled, or could control, the assets in the PACA Trust.  Indeed, the only evidence--at all--concerning Lin's *actual* involvement with Maxsun Produce is that he signed the Federal Express receipt when the company was first sued.  But there is no case even suggesting that that act, alone, would extend PACA Trust liability over Lin.  Accordingly, plaintiffs' application to so extend the preliminary injunctions in this action is denied.

---

[9] Indeed, "most of the cases" finding such secondary PACA liability "have involved claims against the sole shareholder, president or principal officer, and director of the corporation." Weis-Buy Farms, 2012 WL 280617, at *12 (collecting cases). Here, even if still involved with Maxsun Produce in some manner, Lin does not formally appear to hold these titles.

[10] Plaintiffs cite to In re Steinberg, 307 B.R. 310, 314 (S.D. Fla. 2003) in arguing that the proper test on this dispute involves (1) whether the individual in question's involvement with the corporation was sufficient to establish legal responsibility; and (2) whether the individual's failure to oversee the corporation's management breached a fiduciary duty under PACA. See id.; (Bodner Letter at 2-3.) Even if this were the correct test, plaintiffs have proffered no facts suggesting that the legal acts of Lin were attributable to Maxsun Produce or vice versa, or that Lin had any oversight responsibilities of personnel (if there are any) at Maxsun Produce in the first place.

12

CONCLUSION

The Court DENIES plaintiffs' request the extend those preliminary injunctions currently in force and not with effect over the Lin Entities to cover the Lin Entities.

It is therefore

ORDERED that the preliminary injunctions currently in place in these consolidated cases (12 Civ. 6771, ECF Nos. 18, 89; 12 Civ. 7084, ECF No. 14) are hereby VACATED, except to the extent that those orders provide for the various plaintiffs' counsel to hold certain sums for the benefit of plaintiffs and other PACA creditors--those provisions of the orders to remain in force; and

IT IS FURTHER ORDERED that during the pendency of this action, the Qi Entities, their agents, bankers, subsidiaries, successors, assignees, principals, attorneys, and persons acting in concert with them--but not the Lin Entities--shall be and hereby are prevented from transferring, withdrawing or in any other manner removing the assets of the PACA trust, including funds on deposit in bank accounts held by or on behalf of the Qi Entities, from Qi Entities' bank accounts, including any other accounts subsequently discovered to be standing in any of the Qi Entities' names; and

IT IS FURTHER ORDERED that during the pendency of this action, the Qi Entities, their agents, bankers, subsidiaries, successors, assignees, principals, attorneys, and persons acting in concert with them--but not the Lin Entities--shall be preliminary enjoined from engaging in, committing, or performing directly or

13

indirectly, any and all of the following acts: (A) removing, withdrawing, transferring, assigning or selling to any other person or entity, the proceeds from the sales of any or all existing or future inventories of food or other products derived from perishable agricultural commodities, including, but not limited to growing crops, and/or receipts of payment for products sold prior to the date of this order and/or otherwise disposing of assets, books or funds; and/or (B) taking any other action which dissipates plaintiffs' beneficiary interests in the assets of the PACA trust; and

IT IS FURTHER ORDERED that during the pendency of this action, <u>all defendants or other individuals or entities in possession of records related to the business and financial activities of the Qi Entities</u>, upon reasonable notice to counsel, shall provide plaintiffs' counsel with access to the Qi Entities' business books and records, including, without limitation, all invoices, credit memoranda, accounts-receivable ledgers, insurance policies, inventory lists, accounts-payable lists, customer lists, vendor invoices and access to the Qi Entities' computers, computer software and related passwords.

\* \* \*

On January 2, 2013, the Court had ordered Qi to show cause why the Court should not issue a writ of body attachment for Qi based on his contempt of Court due to the inability of plaintiff E. Armata, Inc. to effect personal service upon Qi. The Court indefinitely adjourned the date for Qi to show cause to a date to be set at or after the Court's ruling herein. Accordingly, it is

ORDERED that defendant Qi should show cause on April 3, 2013, at 1:00 p.m. why this Court should not issue a writ of body attachment for Qi. **<u>FAILURE TO APPEAR AT THE SHOW CAUSE HEARING COULD RESULT IN ARREST</u>**.

IT IS FURTHER ORDERED that plaintiff E. Armata, Inc. should serve a copy of this Order on defendant Qi and should file proof of such service on the docket (ECF).

SO ORDERED:

Dated: New York, New York
       March 1, 2013

_____
Katherine B. Forrest
UNITED STATES DISTRICT JUDGE